DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellant, Oscar Santiago, appeals his conviction in the Lorain County Court of Common Pleas. We affirm.
 I.
On December 6, 1999, at approximately 8:48 p.m., Officer Michael Fairbanks and James P. Welsh of the City of Elyria Police Department were dispatched, pursuant to a hang-up 9-1-1 call, to 180 College Park Apartments, Apartment V-1, located in Lorain County, Ohio. When they arrived, they repeatedly knocked on both the front and back doors, identifying themselves as the police. Eventually, the front door was unlocked by Mr. Santiago. Upon entering the apartment, the officers saw blood everywhere. Mr. Santiago was lying face down with his arms spread out and was covered in blood. In response to the officers' immediate questions, Mr. Santiago informed them that he had just killed his girlfriend, Kimberly Yucka, with a hammer. The officers found Ms. Yucka lying partially in the kitchen and partially in the adjoining bathroom in a pool of her blood. Her head was so badly beaten that fragments of her skull, a couple of her teeth, and some brain matter had spilled onto the floor. Ms. Yucka, however, was still breathing very slowly; consequently, the paramedics rushed her to the hospital. Ms. Yucka died shortly thereafter. Mr. Santiago was arrested that night.
On December 29, 1999, the Lorain County Grand Jury indicted Mr. Santiago on one count of murder, in violation of R.C. 2903.02(A). Prior to trial, Mr. Santiago moved to suppress all statements that he made to police. He averred that the statements should be suppressed because the police initially questioned him without reading him his Miranda rights and because, later, after being Mirandized, the officers continued to interrogate him despite the fact that he had invoked his right to counsel. The state responded in opposition. On May 12, 2000, the trial court denied the motion to suppress. Subsequently, the state located and gave the defense an audiotape of Mr. Santiago's statements at the apartment and a videotape of his statements at the police station. After reviewing these tapes, Mr. Santiago moved the trial court to reconsider its denial of his motion to suppress, as some of the statements made by Mr. Santiago were in response to police questioning, contrary to the testimony at the suppression hearing. Pursuant to this request, a hearing was held, during which the state agreed not to use any of Mr. Santiago's statements on the tapes. With this understanding, the trial court denied the motion for reconsideration.
A jury trial was held, commencing on February 6, 2001. Mr. Santiago testified in his defense. In a judgment journalized on February 13, 2001, the jury found Mr. Santiago guilty of murder. He was sentenced accordingly. This appeal followed.
 II.
Mr. Santiago asserts three assignments of error for review. We will discuss each in turn.
 A. First Assignment of Error THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS.
In his first assignment of error, Mr. Santiago avers that the trial court erred in denying his motion to suppress. We disagree.
An appellate court's review of a ruling on a motion to suppress evidence presents a mixed question of law and fact. State v. Long (1998), 127 Ohio App.3d 328, 332. When considering a motion to suppress, a trial court assumes the role of the trier of fact and is therefore in the best position to resolve factual questions and evaluate witness credibility. State v. Smith (1997), 80 Ohio St.3d 89, 105. Thus, "a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas v. United States (1996), 517 U.S. 690, 699, 134 L.Ed.2d 911,920. Accordingly, we will accept the factual determinations of the trial court so long as they are supported by competent and credible evidence; however, without deference to the trial court's conclusion, we will determine "whether, as a matter of law, the facts meet the appropriate legal standard." State v. Curry (1994), 95 Ohio App.3d 93, 96.
At the suppression hearing, Officers Fairbanks and Welsh testified that, on December 6, 1999, at approximately 8:48 p.m., they were dispatched, pursuant to a 9-1-1 hang-up call, to 180 College Park Apartments, Apartment V-1. When they arrived, the apartment had no lights on and the curtains had been pulled shut. The officers began knocking on both the front and back doors of the apartment, identifying themselves as police. A short time later, Sergeant Hammonds and Officer Scott arrived. Sergeant Hammonds knocked on the door and warned that, if necessary, the door would be knocked down. Officer Fairbanks testified that he then heard some movement inside the apartment, heard the deadbolt unlock, and saw the doorknob turn. Officer Fairbanks stated that he again advised the occupant to open the door and subsequently heard a muffled voice saying, "[t]he door is unlocked, come in."
Officer Fairbanks stated that, upon entering the residence, he observed Mr. Santiago lying face down with his arms stretched out, covered in blood. He asked what was going on, and Mr. Santiago allegedly responded that he had just killed his girlfriend. The officer then asked who else was in the apartment. Mr. Santiago responded, "[j]ust my girlfriend. I just killed her." When asked how, Mr. Santiago stated, "with a hammer." At that time, Mr. Santiago was placed in handcuffs, and Officer Scott and Sergeant Hammonds proceeded to search for the victim. Officers Fairbanks and Welsh asked where his girlfriend was located. Mr. Santiago responded that she was in the bathroom-kitchen area and nodded in that direction. Ms. Yucka was then located and rushed to the hospital.
According to Officers Fairbanks and Welsh, Detective Alan Leiby arrived and advised Mr. Santiago of his Miranda rights for the first time that night. Mr. Santiago immediately invoked his right to counsel. Officers Fairbanks and Welsh and Detective Leiby testified that, once Mr. Santiago invoked his right to counsel, all questioning stopped. Mr. Santiago was given clean clothes and transported to the police station. At some point, in the apartment, Mr. Santiago, who had white powder on his nose, told the officers that he had ingested cocaine.
At the police station, Detective Leiby again began advising Mr. Santiago of his Miranda rights, and Mr. Santiago again asserted his right to have counsel. Detective Leiby testified that Mr. Santiago was not questioned. Subsequently, Officers Fairbanks and Welsh transported Mr. Santiago to the hospital, as he claimed to be having chest pains and had indicated that he had ingested a significant amount of cocaine. Officer Fairbanks testified that, at the hospital, Mr. Santiago voluntarily said: "I'm going to do life. How long is life? I'm going to do time, I can't believe I did it." Officer Welsh similarly testified that, Mr. Santiago voluntarily stated at the hospital, "I can't believe I did this. * * * She played me, Welsh. She was kissing another guy in her car on the way home from Cleveland. How long is life in prison? Am I going to do life in prison for this?" According to the officers, Mr. Santiago made these statements despite being reminded of his rights and warned not to make any statements.
Based on the evidence adduced at the suppression hearing, the trial court denied Mr. Santiago's motion to suppress, holding that Mr. Santiago was not in custody until he was placed in handcuffs, and therefore, any statements made prior to that time were voluntary and admissible. The trial court also held that, at the hospital, Mr. Santiago voluntarily chose to speak after being admonished not to do so by the police officers and after invoking his rights; consequently, those statements were admissible. After the trial court's ruling, the state gave the defense an audiotape made by the police of Mr. Santiago's statements at the apartment and a videotape of his statements at the police station. After reviewing these tapes, Mr. Santiago moved the trial court to reconsider its denial of his motion to suppress, as some of the statements made by Mr. Santiago were in response to police questioning, contrary to the testimony at the suppression hearing. The state agreed not to use any of Mr. Santiago's statements on the audiotape and videotape. With this understanding, the trial court denied the motion for reconsideration.
On appeal, Mr. Santiago has first argued that all statements he made after the police entered the apartment should have been suppressed because he was in custody within the meaning of Miranda when the police entered the apartment and saw him lying "in a surrender position" on the ground. We disagree, as we find that, even if Mr. Santiago was in custody as he contends, the public safety exception to Miranda operated to make the statements at issue admissible.
Statements made by a suspect during custodial interrogation are inadmissible unless the suspect is informed of his Miranda rights and voluntarily waives such rights. Miranda v. Arizona (1966), 384 U.S. 436,444, 16 L.Ed.2d 694, 706. In New York v. Quarles (1984), 467 U.S. 649,81 L.Ed.2d 550, the United States Supreme Court set forth a public safety exception to the Miranda requirement. The public safety exception allows the police, under certain circumstances, to temporarily forgo advising a suspect of his Miranda rights in order to ask questions necessary to securing their own immediate safety or the public's safety. See State v. Prim (1999), 134 Ohio App.3d 142, 154-55 (finding that, under the circumstances, the police questioning regarding the location of the gun was permissible under Quarles). This court has extended the public safety exception "to situations where exigent circumstances may excuse compliance with Miranda when there is an overriding need to save human life or to rescue persons whose lives are in danger." State v. Taylor (Dec. 16, 1992), Lorain App. Nos. 92CA005313 and 92CA005314, unreported, at 4. Significantly, this court has held that this exception applies after a suspect is informed of his Miranda rights and invokes his right to counsel in instances of an overriding need to protect human life. Id. at 5-6; see, also, State v. Davis (Nov. 19, 1999), Columbiana App. No. 96-CO-44, unreported, 1999 Ohio App. LEXIS 5492, at *17-18.
In the present case, the officers' questions, when they first entered the apartment, were clearly designed to secure their safety and the public's safety. Officer Fairbanks first asked what happened, and Mr. Santiago responded that he had just killed his girlfriend. At that point, the officers did not know if there were other people involved, who could still be in the apartment lying in wait, and did not know the type and location of weapon used, if any. Officer Fairbanks next asked who else was in the apartment. Mr. Santiago responded, "[j]ust my girlfriend. I just killed her." When asked how, Mr. Santiago stated, "with a hammer." Immediately after obtaining the information necessary to secure their own safety, the police placed Mr. Santiago in handcuffs. However, the police still did not know the actual condition of the victim and her location. As Ms. Yucka may still have been alive and in need of immediate medical care, it was important for the officers to find her as quickly as possible. Thus, the questions regarding the location of Ms. Yucka arose out of concern for the victim's safety and wellbeing. See Taylor, supra, at 5-6 (finding that questioning directed at locating the baby-victim justified the application of the Quarles exception to Miranda, as the baby may still have been alive and in need of care). Accordingly, we conclude that the questions asked by the police before he was handcuffed and the questions regarding the location of the victim shortly after he was handcuffed justified the application of the public safety exception to Miranda; therefore, the trial court properly denied Mr. Santiago's motion to suppress regarding the statements made by Mr. Santiago in response to those questions.
Mr. Santiago next argues that the trial court erred in not suppressing the statements made by him at the apartment and at the police station after he had been advised of his Miranda rights and had invoked his right to counsel. The trial court, however, only denied Mr. Santiago's motion for reconsideration after the state had informed the trial court that it would not use at trial any of Mr. Santiago's statements on the audiotape and videotape. Accordingly, we find no error in the trial court's ruling on this issue. Furthermore, at trial, when the defense began to cross-examine Officer Fairbanks with the tapes, the trial court cautioned the defense that, if it continued to use the tapes in cross-examination, the tapes would be unsuppressed. After this cautioning, the defense expressed its intention to continue using the tapes. The trial court, therefore, deemed the tapes unsuppressed, and the tapes were marked as joint exhibits and admitted into evidence. Consequently, assuming arguendo that the trial court made an error in denying Mr. Santiago's motion for reconsideration, Mr. Santiago waived any error in the suppression of the tapes by introducing them at trial. See State v. Campbell (2000), 90 Ohio St.3d 320, 324 (writing that a defendant may not take advantage of an error which he himself invited or induced); State v. Rollings (July 19, 1991), Fulton App. No. F-88-11, unreported, 1991 Ohio App. LEXIS 3371, at *14 (holding that the defendant had committed invited error by introducing at trial the evidence which he had sought to have suppressed).
Lastly, Mr. Santiago contends that the trial court erred when it failed to specifically analyze in denying the motion to suppress other statements he allegedly made at the scene after he was handcuffed and when he was being driven to the police station and the hospital. Contrary to Mr. Santiago's assertion, however, the trial court did address all of the statements specifically brought to its attention at the suppression hearings and in the briefs on the suppression issue. Consequently, the trial court did not err in that regard. Accordingly, Mr. Santiago's first assignment of error is overruled.
 B. Second Assignment of Error THE TRIAL COURT ERRED IN ALLOWING THE PROSECUTOR TO MAKE IMPROPER REMARKS ABOUT POSSIBLE SENTENCES APPELLANT COULD RECEIVE IF ACQUITTED OF MURDER AND CONVICTED OF MANSLAUGHTER.
In his second assignment of error, Mr. Santiago argues that the trial court erred in allowing the prosecutor to cross-examine Mr. Santiago regarding whether he knew the relative sentences for murder and voluntary manslaughter, thereby improperly suggesting that, if the jury were to acquit Mr. Santiago of murder and convict him of manslaughter, his sentence would be too lenient. We disagree.
In determining guilt, a jury must not consider the punishment that a defendant may receive "except in cases of murder in the first degree or burglary of an inhabited dwelling." R.C. 2945.11. Accordingly, this court has stated that "[a] suggestion that a defendant, if convicted [of a certain offense], may be pardoned or paroled, is improper." State v. McEwen (Apr. 19, 1995), Lorain App. No. 93CA005767, unreported, at 14. Assuming, without deciding, that it was error to allow the prosecutor to cross-examine Mr. Santiago on the relative sentences for murder and manslaughter, we nevertheless find that such error was harmless beyond a reasonable doubt due to the overwhelming evidence of Mr. Santiago's guilt. See Crim.R. 52(A) ("[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded[.]"); State v. Brumback (1996), 109 Ohio App.3d 65, 79.
At trial, Mr. Santiago confessed to bludgeoning Ms. Yucka to death with a hammer but asserted that he did not do so purposely, due to his voluntary intoxication. See State v. Wolons (1989), 44 Ohio St.3d 64,68 (writing that evidence of intoxication is admissible for the purpose of showing that the defendant was not capable of forming the specific intent to commit the crime with which he is charged, if such intent is an element of the offense). Mr. Santiago testified that he was a habitual cocaine user and had ingested a large quantity of cocaine throughout the day which caused him to have auditory and visual hallucinations about Ms. Yucka trying to poison him and having an affair with another man. Despite this testimony, however, there was ample evidence that Mr. Santiago was not so intoxicated as to negate the specific intent required to be convicted of murder, pursuant to R.C. 2903.02(A), and that he purposely caused the death of Ms. Yucka. "A person acts purposely when it is his specific intention to cause a certain result[.]" R.C. 2901.22(A).
On the audiotape of the 9-1-1 call, which was admitted into evidence and played for the jury, a female can be heard crying: "They're lying. They're lying. I swear to God." The phone call ended abruptly. The police later discovered that two telephones in the house had their cords removed from the walls. A neighbor similarly testified that she heard a male voice yelling, a female crying, loud thuds and bumps, followed by silence.
Andrea D. McColom, M.D., Deputy Coroner at the Cuyahoga County Coroner's Office, performed the autopsy of Ms. Yucka and testified that the cause of Ms. Yucka's death was blunt impact blows to the head, trunk, and extremities with skeletal and brain injuries. Dr. McColom related that Ms. Yucka was struck nineteen times on her head. Ms. Yucka also had been beaten on other parts of her body, as evidenced by multiple contusions and fractured ribs. She also had sustained several defensive wounds. The blows to Ms. Yucka's head caused multiple skull fractures exposing her brain. Dr. McColom believed that, due to the severity of her injuries, Ms. Yucka could not have been saved. Autopsy photographs corroborating Dr. McColom's testimony were admitted into evidence and shown to the jury.
At trial, Mr. Santiago testified that he began beating Ms. Yucka at first with his hands and then with the hammer when she went upstairs to escape. Although the police recovered a broken, bloodied iron from the upstairs of the apartment, Mr. Santiago testified that he did not remember hitting Ms. Yucka with the iron. He, however, testified that he partially remembered hitting Ms. Yucka with the hammer. Mr. Santiago also remembered chasing Ms. Yucka from room to room while she screamed. The police found blood in several rooms of the apartment and recovered a couple of Ms. Yucka's teeth from different locations.
Mr. Santiago further testified that, shortly after bludgeoning Ms. Yucka, he wiped the blood from his face and eyes with his shirt because he was having difficulty breathing and seeing, but could not remember trying to wash the blood off his shirt in the sink. He then went upstairs to overdose on cocaine. While upstairs, he telephoned his cousin's husband telling him that he had killed Ms. Yucka, opened the safe where the cocaine was kept, and ingested more cocaine. When the police arrived, all the lights in the apartment, except the room he was in, were turned off and the windows covered. There was evidence suggesting that Mr. Santiago had peered out the covered windows, as there was blood smeared on the window dressings.
When the police entered the apartment, Mr. Santiago was covered in blood lying face down on the floor with his arms stretched out. According to the officers, Mr. Santiago told them that he had "just killed [his girlfriend]" with "[a] hammer[.]" He also eventually stated that Ms. Yucka had "played" him explaining that Ms. Yucka had been seen kissing another man in her truck. At some point, he also asked: "Am I going to do life in prison? How long is life in prison?" Significantly, he did not mention to the officers that he believed that Ms. Yucka was trying to poison him, as he had testified at trial. Moreover, on the audiotape recorded at the apartment, Mr. Santiago's speech, although slow and somewhat muffled, was coherent. Officer Fairbanks, who observed Mr. Santiago at the apartment immediately after the crime was committed, testified that Mr. Santiago was "very coherent[.]" Similarly, the nurse, who examined Mr. Santiago for a drug overdose that night, stated that Mr. Santiago was coherent, had normal speech, and did not appear to be "high[.]" She further related that Mr. Santiago did not exhibit symptoms consistent with a cocaine overdose.
After a thorough review of the record, we conclude that any error in permitting the prosecutor to cross-examine Mr. Santiago on the relative sentences for murder and manslaughter was harmless beyond a reasonable doubt due to the overwhelming evidence of Mr. Santiago's guilt. Accordingly, Mr. Santiago's second assignment of error is overruled.
 C. Third Assignment of Error THE TRIAL COURT ERRED IN ALLOWING THE STATE TO INTRODUCE REPETITIVE AND PREJUDICIAL PHOTOGRAPHS OF THE VICTIM.
In his third assignment of error, Mr. Santiago contends that the trial court abused its discretion in admitting gruesome, inflammatory, repetitive, and prejudicial photographs. We disagree.
Under Evid.R. 403, the admission of photographic evidence rests within the sound discretion of the trial court. State v. Jalowiec (2001),91 Ohio St.3d 220, 229; State v. Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus. Therefore, absent an abuse of discretion, an appellate court will not disturb the decision of the trial court. Sage,31 Ohio St.3d at 182. An abuse of discretion is more than an error of judgment, but instead demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." Pons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, 621. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Id.
In noncapital cases, the admission of potentially prejudicial photographs is determined under a balancing test: the probative value of the photographs must be substantially outweighed by the danger of unfair prejudice to warrant exclusion. Evid.R. 403; see, also, State v. Franklin (1991), 62 Ohio St.3d 118, 125; State v. Huth (July 31, 1996), Summit App. No. 17351, unreported. Significantly, such photographs may be used to corroborate the testimony of witnesses, to help establish the intent of the accused, or to show the nature and circumstances of the crime. See Jalowiec, 91 Ohio St.3d at 230. Moreover, the fact that the parties stipulate to the cause of death does not automatically render the photographs inadmissible. State v. Maurer (1984), 15 Ohio St.3d 239, 265.
In the case sub judice, Mr. Santiago avers that State exhibits 8-A and 8-B duplicated photographs that were already authenticated and introduced by the coroner, because they depict the murder weapon, a hammer, matched up to one of Ms. Yucka's head wounds. He further contends that, as "there was never an issue concerning how the injuries were inflicted and through which implement," the photographs had no probative value and were extremely prejudicial; therefore, they should have been excluded from evidence. We disagree.
Contrary to Mr. Santiago's assertion, the two photographs do not contain a hammer and are neither repetitive nor cumulative of the other photographs admitted at trial. State exhibits 8-A and 8-B were photographs of Ms. Yucka's head injuries taken by the police at the hospital. Exhibit 8-A shows Ms. Yucka's blood-covered face and bruised eyes, while Exhibit 8-B mainly shows her blood-soaked hair which had pieces of brain and other tissue embedded in it. Although gruesome, they are the only photographs admitted into evidence that show the condition of Ms. Yucka's head shortly after the crime was committed. The autopsy photographs, on the other hand, show Ms. Yucka's physical condition after the coroner had substantially removed the blood and tissue fragments from her face and hair and had partially shaved her head to expose the wounds.
Moreover, these photographs had significant probative value. At trial, Mr. Santiago employed the defense of voluntary intoxication, arguing that he was unable to form the specific intent to kill due to his cocaine ingestion. See R.C. 2903.02(A) (stating that "[n]o person shall purposely cause the death of another or the unlawful termination of another's pregnancy"). Consequently, these photographs were important in demonstrating the amount of force used in striking Ms. Yucka, and therefore, were indicative of intent to kill. See State v. Tibbetts (2001), 92 Ohio St.3d 146, 156. They also corroborate the testimony of the police officers and the paramedic, who testified as to the severity of Ms. Yucka's injuries when they first saw her at the apartment. We note that the trial court carefully considered these photographs before admitting them into evidence over Mr. Santiago's objections.
Based on the foregoing, we conclude that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. See Evid.R. 403(A). Therefore, the trial court did not abuse its discretion in admitting the photographs. Mr. Santiago's third assignment of error is overruled.
 III.
Appellant's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
CARR, J, CONCURS